United States Bankruptcy Court
Southern District of Texas
**ENTERED**
August 09, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § § | **CASE NO: 20-32643** |
| ENTREC CORPORATION | § | |
| and | § | **CHAPTER 15** |
| ENT OILFIELD GROUP LTD. | § | |
| and | § | |
| CAPSTAN HAULING LTD. | § | |
| and | § | |
| ENT CAPITAL CORP. | § | |
| and | § | |
| ENTREC HOLDINGS INC. | § | |
| and | § | |
| ENTREC CRANES & HEAVY HAUL INC. | § | |
| and | § | |
| ENTREC SERVICES LTD., | § § | |
| Debtors. | § § | |
| WOLVERINE ENERGY AND INFRASTRUCTURE INC., | § § § | |
| Plaintiff, | § § | |
| VS. | § § | **ADVERSARY NO. 20-3455** |
| ENT CAPITAL CORP. | § | |
| and | § | |
| ENTREC HOLDINGS INC. | § | |
| and | § | |
| ENTREC CRANES & HEAVY HAUL, INC. | § | |
| and | § | |
| ENTREC CORPORATION, | § § | |
| Defendants. | § | |

## MEMORANDUM OPINION

Wolverine and ENTREC entered into an Asset Purchase Agreement for the sale of equipment. Wolverine gave ENTREC a deposit. The contemplated transaction did not close, and Wolverine wants its deposit back. Under the APA, Wolverine must have been ready, willing, and

able to close as of the closing date to get the deposit back. ENTREC argues that Wolverine is not entitled to the deposit because Wolverine was not ready, willing, and able to close as of the closing date. ENTREC is correct.

## BACKGROUND

On May 15, 2020, ENTREC Corporation and its affiliates commenced bankruptcy cases in Canada and the United States. (Case No. 20-32643, ECF Nos. 1; 54 at 5). On May 29, 2020, the Court recognized the Canadian proceeding as a main foreign proceeding. (Case No. 20-32643, ECF No. 36 at 4). To complete its bankruptcy, ENTREC and various affiliates entered into a contract to sell its machinery and equipment in the United States to Wolverine Energy and Infrastructure Inc. on August 24, 2020 (the "APA"). (ECF No. 36 at 2). The Canadian court approved the APA on August 31, 2020, and this Court approved the APA on September 9, 2020. (Case No. 20-32643, ECF Nos. 68 at 2; 68-1 at 2).

ENTREC hired Rouse Appraisals LLC to determine the value of its equipment, including cranes, trucks, tractors, and trailers. (ECF No. 36-7 at 4). Rouse appraised the asset values as of May 31, 2020. (ECF No. 36-7 at 4). Great Rock Capital—Wolverine's lender—also hired Rouse to appraise the equipment. (ECF No. 37 at 4). Rouse again appraised the asset values, this time as of July 31, 2020. (ECF No. 37 at 4).

The APA set a purchase price of CAD[1] $33,500,000. (ECF Nos. 5 at 3–4; 36 at 14–15, 17; Case No. 20-32643, ECF No. 54 at 6–7). Pursuant to Section 2.3(a) of the APA, Wolverine deposited CAD $3,350,000 with ENTREC's bankruptcy monitor.[2] (ECF Nos. 1 at 7; 5 at 3; 36 at

---

[1] The contract purchase price is set in Canadian Dollars (CAD). (ECF No. 36 at 17).

[2] The Canadian court appointed Alvarez & Marsal Canada Inc. as ENTREC's monitor. On November 24, 2020, the Canadian court entered an order terminating the Canadian proceedings and discharging Alvarez & Marsal. (ECF No. 115 at 2). Under the Canadian court's termination order, Alvarez & Marsal "shall continue to hold [the Wolverine deposit] pending a . . . final judicial determination of the Wolverine Dispute . . . ." (ECF No. 115 at 8).

17). The APA set September 15, 2020 as the closing date. (ECF No. 36 at 8, 17). On September 11, 2020, the parties extended the closing date to 2:00 p.m. on September 30, 2020. (ECF Nos. 36 at 13; 41-9 at 2).

Under Section 4.1 of the APA, Wolverine had the right to conduct a field exam within one week before the closing date. (ECF No. 36 at 21). Under Section 2.4, if Wolverine found "damage or unreasonable wear and tear" of the assets in the field exam, then it had the right to require ENTREC to (i) repair the assets or (ii) reduce the purchase price.[3] (ECF No. 36 at 19, 21).

On September 22, 2020, Wolverine noticed a reported decrease in Rouse's orderly liquidation values "due to lack of maintenance and excess wear and tear."[4] (ECF No. 37-11 at 4). Wolverine then conducted its own field exam in late September. (ECF Nos. 42-5 at 2; 76 at 24; 135 at 18, 67, 103; 85 at 44–45).

On September 23, 2020, Wolverine requested a CAD $2,300,000 reduction in the purchase price pursuant to Section 2.4 of the APA. (ECF No. 36-3 at 8, 18). ENTREC correctly alleged

---

For the balance of this opinion, the Court assumes that Alvarez & Marsal acts as an agent with respect to the disposition of the deposit.

[3] Section 2.4 states:

> Until completion of this Agreement on the Closing Date, the Purchased Assets shall be and remain at the risk of the Sellers. Based off a field exam to be conducted pursuant to Section 4.1 by the Buyer, in the event of any damage or unreasonable wear and tear of the Purchased Assets, as compared with the most recently updated appraisal of the Purchased Assets, on or before the Closing Date the Buyer may elect (i) to require the Sellers to repair the Purchased Assets to the same state and condition as it was in at the time this Agreement was entered into in which event the Buyer will complete the transaction without an abatement in the Purchase Price; or (ii) to reduce the Purchase Price by an amount equal to the cost required to complete the repair and/or any depreciations in value as a result of unreasonable wear and tear as estimated by an independent qualified mechanic, architect, equipment appraiser, or engineer retained by the Sellers in which event the Buyer will complete the transaction and accept the price reduction equal to such cost.

(ECF No. 36 at 19).

[4] The orderly liquidation value decreased from Rouse's May 31, 2020 assessment to Rouse's July 31, 2020 assessment. (ECF No. 37-11 at 5).

that Section 2.4 requires that any price reduction be "[b]ased off a field exam to be conducted pursuant to Section 4.1 by the Buyer." (ECF Nos. 36 at 19; 36-3 at 14). ENTREC argued that Wolverine could not trigger Section 2.4 based on the Rouse exams. (ECF No. 36-3 at 14). However, ENTREC's factual premise was wrong. The Rouse exams triggered the concern about value, but Wolverine conducted its own field exam.[5] (*See* ECF No. 85 at 44–45).

At 5:39 p.m. on September 29, 2020, Wolverine requested a seven-day extension to the September 30, 2020 closing date "to complete its investigation . . . ." (ECF No. 107-6 at 2). At 6:24 p.m., ENTREC rejected the seven-day extension. (ECF No. 107-6 at 5). At 11:31 p.m., Wolverine formally elected to reduce the purchase price by CAD $2,300,000 pursuant to Section 2.4. (ECF No. 36-3 at 16–19). Wolverine did not specify the damaged assets on which it based the reduction. (*See* ECF No. 106-15 at 3–4).

At 10:18 a.m. on September 30, 2020, ENTREC proposed to close at the original purchase price and hold the disputed CAD $2,300,000 in escrow pending a judicial resolution. (ECF No. 36-3 at 29–32). At 12:49 p.m., Wolverine filed a formal notice of termination. (ECF No. 36-3 at 33–35). In the same letter, Wolverine also required that ENTREC return the deposit pursuant to Section 2.3(b)(i)(C). (ECF No. 36-3 at 35). ENTREC did not return the deposit.

Section 2.3(b) of the APA governs the return of the deposit. (ECF No. 36 at 17). Under Section 2.3(b)(i), either the parties will close, ENTREC will terminate, or Wolverine will terminate. (ECF No. 36 at 17–18). If Wolverine terminates, Section 2.3(b)(i)(C) governs:

> [I]f this Agreement is terminated by Buyer under Section 3.4(b) or 3.4(c) and Buyer has performed or is ready, willing and able to perform all of its agreements and

---

[5] While Wolverine first invoked Section 2.4 because of the discrepancy between the Rouse exams, Wolverine conducted its own field exam in late September. (ECF Nos. 42-5 at 2; 76 at 24; 135 at 18, 67, 103; 85 at 44–45). Wolverine's field inspectors found unreasonable wear and tear of CAD $2,300,000 on the assets compared to Rouse's July 31 appraisal. (ECF No. 36-3 at 18). The Court previously determined that Wolverine conducted a field exam in compliance with Section 4.1. (ECF No. 85 at 44–45). The Court reaches no determination on whether there was a decline in value or of the amount of any decline.

>covenants contained herein which are to be performed or observed at or prior to Closing, then the Deposit Amount shall be promptly released by the Monitor to the Buyer, and all other remedies (except for the provisions of Sections 3.5, 6.5, 10.3 and this Section 2.3, which shall continue in full force and effect in accordance with their terms) are hereby expressly waived by Buyer and Seller.

(ECF No. 36 at 18).  If Wolverine terminates, ENTREC must return the deposit if: (i) Wolverine terminates under Sections 3.4(b) or (c) ***and*** (ii) Wolverine is ready, willing, and able to perform its obligations under the APA.  (ECF No. 36 at 18).  Wolverine specifically terminated pursuant to Sections 3.4(b) and (c): "Wolverine hereby terminates the APA effective immediately under clause 3.4(b) and (c) of the APA . . . ."  (ECF No. 36-3 at 35).  After the parties failed to close, Wolverine filed this adversary proceeding on November 2, 2020.  (ECF No. 1).  The Court held evidentiary hearings and took the matter under advisement.

## JURISDICTION

To enter a final judgment, a bankruptcy court must have subject matter jurisdiction and the authority to enter a final judgment.  This Court has jurisdiction over this matter under 28 U.S.C. § 1334.

Two types of authority govern a bankruptcy court's ability to enter a final judgment: statutory authority under 28 U.S.C. § 157 and constitutional authority under Article III of the Constitution.  *In re EP Energy E&P Co., L.P.*, No. 19-35647, 2021 WL 5917771, at *9 (Bankr. S.D. Tex. Dec. 14, 2021) ("This Court's authority to finally adjudicate the Temporary Cessation Claim turns on whether the Claim's adjudication is a 'core' or a 'non-core' proceeding, as well as the constitutional limits identified in *Stern*.").

Congress granted bankruptcy courts authority to "hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11."  28 U.S.C. § 157(b)(1).  Section 157(b)(2) is a non-exhaustive list of examples of statutorily core proceedings.

§ 157(b)(2). However, a bankruptcy court may enter a final judgment on a statutorily non-core claim if the parties consent. § 157(C)(2); *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 34 (2014) ("If all parties 'consent,' the statute permits the bankruptcy judge 'to hear and determine and to enter appropriate orders and judgments' as if the proceeding were core.").

Article III of the Constitution restricts Congress from authorizing bankruptcy courts to enter final judgments on certain claims. *See Stern v. Marshall*, 564 U.S. 462, 482 (2011) ("Although we conclude that § 157(b)(2)(C) permits the Bankruptcy Court to enter final judgment on [the estate's] counterclaim, Article III of the Constitution does not."). However, a bankruptcy court may enter a final judgment on a *Stern* claim (*i.e.*, a claim that is designated for final adjudication in the bankruptcy court under § 157 but prohibited from proceeding in that way as a constitutional matter) if the parties consent. *Wellness Intern. Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015) ("Article III is not violated when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge.").

> The parties have consented to this Court entering a final judgment:
>
> [T]he U.S. Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the U.S. Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the U.S Court . . . .

(ECF No. 36 at 32). Because the parties consented to the Court entering a final judgment, the Court need not determine whether it has statutory or constitutional authority to enter a final judgment. Venue is proper in this District consistent with 28 U.S.C. § 1410.

**DISCUSSION**

Having terminated the APA, Wolverine wants its deposit back. ENTREC primarily argues that Wolverine was not ready, willing, and able to close on the closing date. If Wolverine was not ready, willing, and able to close, ENTREC does not have to return the deposit.

Section 2.3(b) of the APA lists the circumstances in which ENTREC must return the deposit. (ECF No. 36 at 17–18). Only Section 2.3(b)(i)(C) is pertinent.[6] For ENTREC to be obligated to return the deposit under Section 2.3(b)(i)(C), Wolverine must have (i) terminated under Sections 3.4(b) or (c) ***and*** (ii) been ready, willing, and able to perform its obligations under the APA.[7] (ECF No. 36 at 18, 20). Wolverine was not ready, willing, and able to perform, so the Court need not assess whether Wolverine properly terminated under Sections 3.4(b) or (c).[8]

The burden of proof with respect to whether Wolverine was ready, willing, and able to close rests with Wolverine. *See MDK Sociedad De Responsabilidad Limitada v. Proplant Inc.*, 25 F.4th 360, 369 (5th Cir. 2022) (citing *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998)) ("A party seeking to recover under a contract bears the burden of proving that all conditions precedent have been satisfied."). Wolverine seeks to recover its deposit under Section 2.3(b)(i)(C). A condition precedent to recovering the deposit under Section

---

[6] Section 2.3(b)(i)(A) does not apply because the parties did not close. Section 2.3(b)(i)(B) does not apply because ENTREC did not terminate the APA. Section 2.3(b)(ii) does not apply because Wolverine is not a "Back Up Bidder." Section 2.3(b)(iii) does not apply because the Court approved Wolverine as the purchaser. Section 2.3(b)(iv) is a catchall that applies where the agreement is terminated "for reasons other than those set forth above." (ECF No. 36 at 18). Because Wolverine requested the deposit under Section 2.3(b)(i)(C), Section 2.3(b)(iv) does not apply.

[7] Section 2.3(b)(i)(C) also applies if Wolverine terminates under Sections 3.4(b) or (c) and "has performed . . . all of its agreements and covenants contained [in the APA] which are to be performed or observed at or prior to Closing." Wolverine had not performed at the time it sought return of the deposit pursuant to Section 2.3(b)(i)(C). For example, under the APA, Wolverine is obligated to pay the purchase price at closing. (ECF No. 36 at 17). When Wolverine invoked Section 2.3(b)(i)(C), it had not paid the purchase price. The appropriate metric for the allegedly non-breaching, non-performing party is whether it was ready, willing, and able to perform.

[8] The Court assumes, without finding, that Wolverine properly terminated under Sections 3.4(b) and (c).

2.3(b)(i)(C) is that Wolverine was ready, willing, and able to perform on the closing date. *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992) ("A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation."). As the party seeking to recover under the contract, Wolverine must prove that it was ready, willing, and able to perform on the closing date.

Under Section 10.5, the APA should be governed by and construed in accordance with Texas law. (ECF No. 36 at 32). In Texas, "objective intent is the alpha and omega of contract interpretation . . . ." *Harris Cnty. Water Control & Improvement Dist. No. 89 v. Phila. Indem. Ins. Co.*, 31 F.4th 305, 310 (5th Cir. 2022). If determinable from the text, the parties' unambiguous[9] expression of objective intent governs. *Id.* (quoting *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 743 (Tex. 2020)). Further, contract terms should be "given their plain, ordinary meaning unless the [contract] itself shows that the parties intended the terms to have a different, technical meaning." *See Am. Nat. Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir. 2001) (citing *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984)) (applying Texas contract law to interpret an insurance policy).

The APA does not define "ready, willing and able." The Court will give "ready, willing and able" its plain, ordinary meaning.

Black's Law Dictionary defines "ready, willing, and able" as "legally and financially capable of consummating a purchase." *Ready, Willing, and Able*, BLACK'S LAW DICTIONARY (11th ed. 2019). Similarly, the Oxford English Dictionary defines "ready" as "[w]illing, eager; feeling or exhibiting no reluctance to . . . do something" or "prepared or having made all

---

[9] An unambiguous writing is reasonably susceptible to a single meaning while an ambiguous writing is reasonably susceptible to more than one meaning. *Compton v. Anderson (In re MPF Holdings US LLC)*, 701 F.3d 449, 457 (5th Cir. 2012). In the context of the APA, there is no ambiguity.

preparations to do something."[10]  *Ready*, OXFORD ENGLISH DICTIONARY (3d ed. 2008).  To determine if Wolverine was "ready, willing, and able," this Court will first determine whether Wolverine was able to close the transaction on September 30, 2020.

On August 12, 2020, Wolverine signed a commitment letter with Great Rock to finance the purchase contemplated by the APA.  (ECF No. 109-8).  The parties were in the process of drafting a "Loan and Security Agreement" (the "loan agreement")[11] and a "General Security Agreement" (the "security agreement") prior to the closing date.[12]  (ECF No. 114-2).  However, Wolverine did not demonstrate by a preponderance of the evidence that it completed either agreement with Great Rock.  (ECF No. 114-4).  The unsigned September 22, 2020 loan agreement draft contains several redline comments and incomplete schedules.  (*See* ECF No. 114-4).  Wolverine and Great Rock never agreed on final versions.[13]

Wolverine's CEO testified that (i) in his experience, loan documents are typically filled out on closing days; (ii) "[f]rom everything Great Rock communicated to me, and that counsel communicated to me, [the loan agreement and security agreement] were finalized, waiting only for the price adjustment that needed to be dropped in so that they could send them"; (iii) "[w]e would have had no issue closing on time and concerning this transaction"; (iv) and Wolverine "has relationships with existing lenders" to finance the purchase if had not been able to finance with

---

[10] These definitions apply particularly where "ready" is used with an infinitive.  *Ready*, OXFORD ENGLISH DICTIONARY (3d ed. 2008).  "[T]o perform" follows "ready, willing and able" in Section 2.3(b)(i)(C).  Thus, these definitions are instructive.

[11] The unsigned and redlined loan agreement draft is dated September 22, 2020.  (ECF No. 114-4 at 2).

[12] An unsigned security agreement draft was emailed September 14, 2020.  (ECF No. 114-3 at 2).

[13] As ENTREC's counsel argued at the November 12, 2021 hearing, "[y]ou won't see a closing binder of everything ready to be executed, finalized, execution versions of the agreement. They simply aren't there."  (ECF No. 124 at 32).

Great Rock. (ECF No. 124 at 86–88, 91, 111, 117, 167–68). However, Wolverine ultimately stipulated that the unsigned and unfinished documents were the only ones it could find. (ECF No. 124 at 79–83). Wolverine did not contest ENTREC's assertions that (i) there are no further versions of its documents with Great Rock, and (ii) as of September 30, 2020, the unsigned documents represent the state of Wolverine's loan documents. (ECF No. 124 at 79–83). Wolverine's CEO was generally credible. Nevertheless, his statements that he believed that Wolverine could close are rejected in light of the objective evidence to the contrary.

If the only incomplete portions of the agreements were matters that would have been obvious at the closing (such as the adjusted purchase price), Wolverine's argument might carry the day. But the loan agreement contains numerous examples of missing subjective information and changes that appear unresolved. For example:

(i) Numerous suggestions in the September 22, 2020 version of the loan agreement appear unresolved. (ECF No. 114-4 at 2–103).

(ii) The disclosure schedule to the loan agreement is blank, which ought to include information about the loan parties, collateral, litigation, commercial tort claims, deposit accounts, intellectual property, trademarks, insurance, permitted indebtedness, permitted liens, motor vehicles, other assets, and fixtures. (ECF No. 114-4 at 104–07).

(iii) The financial covenants in Schedule E to the loan agreement are blank, which ought to include the borrower's minimum required EBITDA, the borrower's minimum required liquidity, the fixed charge coverage ratio, and the loan parties' maximum capital expenditures. (ECF No. 114-4 at 135–36).

The agreements contain other inconsistencies and omissions too voluminous to recount here. Wolverine's CEO was confident that these issues would be resolved. That is not the question. The question is whether they would have been resolved by the September 30, 2020 outside closing date. Wolverine has not established by a preponderance of the evidence that all matters would have been resolved to allow a September 30 funding and closing.

On September 29, 2020—one day before the closing date—Wolverine requested a seven-day extension. (ECF No. 107-6 at 2). Wolverine requested this extension to "complete its investigation" in order to "work towards a mutually acceptable outcome." (ECF No. 107-6 at 2). The deadline for closing on September 30, 2020 was 2:00 p.m. (ECF No. 36 at 13). At 7:22 p.m. on the closing date, Wolverine stated that it remained "willing and able" to close despite having already sent the termination letter. (ECF No. 107-9 at 3). By 7:22 p.m. on the closing date, the closing documents were incomplete and the funds had not been wired. There is no question that the 2:00 deadline passed without funding. In the 7:22 p.m. letter, Wolverine provided two paths forward: (i) pay the purchase price minus the disputed amount by October 10, 2020 or (ii) extend the closing date to "permit Entrec to hire the independent party required to assess Wolverine's claim under Clause 2.4 of the APA . . . ." (ECF No. 107-9 at 3). Both options envision closing significantly after the already-missed closing date, which indicates that Wolverine was not ready, willing, and able to close by the deadline.

Finally, Wolverine rejected ENTREC's offer to close into escrow pending a judicial resolution where Wolverine would pay the full purchase price and a court would later determine whether the purchase price should be reduced. Closing into escrow would have avoided the present litigation and resulted in the decreased purchase price if that was, in fact, appropriate. The unwillingness to engage in an otherwise risk-free judicial resolution is a further indication that Wolverine was not ready, willing, and able to close by the deadline.

The APA states:

UPON CLOSING, BUYER SHALL BE DEEMED TO HAVE ACCEPTED THE PURCHASED ASSETS, AND RELATED OBLIGATIONS, UNCONDITIONALLY AND WITH ANY AND ALL (NONE BEING SO IMPLIED) RIGHTS TO RESCIND, SET ASIDE OR AVOID THE TRANSACTIONS CONTEMPLATED HEREBY OR TO SEEK A REDUCTION, ADJUSTMENT, OFFSET OR RECOVERY OF THE PURCHASE PRICE, ON

>   THE GROUNDS OF REDHIBITION OR OTHERWISE, WAIVED AND
>   RELINQUISHED.

(ECF No. 36 at 25). Wolverine's argument that it would have waived any rights to adjust the purchase price if it agreed to close into escrow is unpersuasive: the parties could have agreed to override the APA. To unwaveringly adhere to the terms of the APA despite closing into escrow would defeat the purpose of the escrow. Wolverine's CEO testified that they were open to an escrow agreement, but still needed an extension because "it wouldn't get settled in one day." (ECF No. 124 at 104). Wolverine's CEO also testified that ENTREC did not offer an override of the terms of the APA, but he did not testify that Wolverine sought the override in lieu of an extension. (ECF No. 124 at 104–05). Wolverine had an option to close into escrow and retain its right to an adjustment in the purchase price.

Wolverine did not produce a completed loan agreement or security agreement with Great Rock, indicating its funding was not yet in order. Wolverine only offered solutions resulting in significant delays beyond the closing date, indicating it preferred to close in the future. Finally, Wolverine refused to engage in a seemingly simple solution of closing into escrow. The preponderance of the evidence indicates that Wolverine was not "ready, willing and able" to close on September 30, 2020. Because Wolverine fails to prove that it was able to close on or before 2:00 p.m. on September 30, 2020, it is not entitled to the return of its deposit.[14]

---

[14] The Court is concerned with the fairness of this result. If ENTREC breached first, should Wolverine lose its deposit? Nevertheless, the APA has specific "bargained for" provisions with respect to the deposit's return. The provisions are not necessarily unreasonable, and they are certainly not arbitrary requirements. If a party is unable to close, the party might look for "excuses" to its performance more vigorously than otherwise. Thus, the provisions requiring that Wolverine had to be able to close can reasonably be enforced as a means to deter Wolverine from manufacturing an excuse. In that light, the provisions may be reasonable, and in any event, the provisions are non-arbitrary contractual requirements.

## CONCLUSION

A separate judgment will be entered.

SIGNED 08/09/2022

_____
Marvin Isgur
United States Bankruptcy Judge